The next case today, No. 241474 and 241867, United States v. Tevin Abercrombie. Will counsel for the appellant please come up and introduce yourself on the record to begin. Good morning, your honors. I'm Stephen Super, and I'm representing Tevin Abercrombie this morning. And with me at counsel table is George Gormley, who is Tevin's trial counsel. So when Tevin Abercrombie was arrested in the Jamaica Plain Dorchester area, and they found a gun under his seat, we started looking at this case. Our concern was that he was going to be convicted at trial by our preponderance of the evidence. And essentially that's what happened. And now we find ourselves at appeal. And my concern and appeal is that when you affirm this conviction, and I don't want to be fatalistic, but it kind of looks that it might go that way. I think this is going to blur the line even more between. Why does it look like it's going that way? To detect something from our faces? Is the AI deciding it already? No, the history. This is the kind of case, at least in my experience, that you would issue an opinion on the briefs. So I'm very happy to be here. I'm curious as to why an oral argument has been called, but I'm happy to advocate for Mr. Abercrombie because I don't think throughout his entire life he had a lot of people advocating for him. Why do you think the case is so bad? I don't think it's bad. I think it's. Why don't you just make the argument for why you think the case, you should win. That would just help us. What are the facts that you think show that under Jackson we cannot affirm? I think that, well, I think this is a constructive possession case. And under most of the cases of the First Circuit where they found constructive possession, they've been mostly actual possession. This is not a case where there was circumstances that led to actual possession. This is not where I wanted to start, but I'm going to. In reading the government's brief, the government cited a few cases on constructive possession, what the First Circuit has affirmed, convictions. And of course, the government cited these for other propositions. You have one line, you state that, and then you give the case citations, what we all do when we write briefs. But when I read those cases, they all seemed to have one thing in common, and that was, there was disclosed actual possession in that case. And if you'll indulge me for a few moments. By the way, could I have three minutes for rebuttal? Sorry, I forgot to tell you. They cited the Fernandez-George case, this case, a 2018 case here. In that case, there was a shootout in Puerto Rico, and several defendants scurried off and went into a tunnel, which I think was a sewer, because there was a manhole. They catch one of the defendants who said that he did not constructively possess any of the guns they found down in that tunnel. They found him with 30 bullets in his pocket. So there was something to connect him to that. Government cited the Burgess case, a 2025 case, just came out. Defendant is seen with a firearm. He tosses it as he runs out of the house. They see him with the gun, and then they go in and they find, they also charge him with constructively possessing ammunition. And in that room that he was in, there's a red duffel bag there that has ammunition in it. And on his phone is a video of that red bag. He's filming it. So this court determined that he had some sort of stake in that ammunition. Again, pretty close to an actual possession case. And I could read the others, but... Counsel, what about Laronzo? The Laronzo case? I think that is a true constructive possession case, but perhaps you would disagree. Yeah. Okay. So we have a car. And they stop it, and they find out that there's a gun in the car. And they see the occupants moving around in the car after the stop. But the stop occurred after they took off on a chase. So there you have a consciousness of guilt. There's probably something in the car. And that's not what you have in this case. You had a stop where the driver, Dominic Douglas, is driving a car along Parker Street. And he's driving into a gauntlet of police vehicles. Because they've all been called there after there was a report of a shooting. And he's calmly driving, and they calmly stop the car. And there isn't those circumstances that you find in these cases. Just going through the three circumstances that the government identifies as most salient. And you just tell me why they don't add up to being enough. Given that we're on sufficiency, we're not the jury. The first, they say, is it's under the front passenger seat of the car. Correct. And it's angled in a way, there's testimony, that would be consistent with the person who sat in that seat having placed it there. That's point one, they say. Point two, there's no evidence that anybody else ever was in that front seat other than the defendant. And point three is, there's testimony that even though it wasn't in plain view, the person in that front seat was seen bobbing his head up and down in a way that would have, you could infer, let him see the gun. So those three things are what they highlight as three facts that together would support a rational juror inferring he had placed the gun there and he was aware that the gun was there. I'll give point four just to end it, which is he has the glove on one hand, and the idea is that that's suggesting he would want to use the gun without prints being on it. That's a suggestion. Thank you, Judge, because I'm going to tie that into the position of the gun under the seat. I have no argument on whether or not he had dominion and control over that seat. This is a sedan. It's a Ford Fusion. It's a very small car. It's not across the aisle from two plane seats. You're right there in a tight compartment. There's no argument that he's the only person who has dominion and control over that area. He says, I have dominion and control over this podium at the moment. I don't know what's inside this cabinet underneath me. I didn't come and check. There could be something. There could be a gun. There could be papers. Our position on that was, I noticed when you three came in here and sat down, none of you looked under your seat. So I don't know if you could tell me with 100% certainty that there isn't something under there, a pen or a cup or a paper. But he does have control over that. And in the 15-minute pendency of this entire case, he's the only one who's riding in that seat. But we don't know what happened along the way. We don't know when it was parked at Dominic Douglas' driveway. We don't know who was riding then. Counsel, but I presume those are arguments that you made to the jury and we're supposed to look at the sufficiency of the evidence by looking at all the various factors that government identified together, obviously. So why do you think that looking at these three, four, five points, whatever the right number may be, together, it was not sufficient for a rational jury to find constructive possession? Is there something in particular you really want to highlight for us? Well, there's two things. We brought them up here. One was the video, because this was almost an entirely filmed incident, except for the actual Terry stop, which I thought was significant that it was not filmed. But at least when this crew drives over to Fuentes Market, which was about a block from where the drive-by shooting occurred, there was a camera pointed straight down. So it captured a lot of what was happening, but it didn't capture everything. This fusion was fairly heavily tinted, and the only thing you could really see on the monitors to the jury, to the judge, was anything that was somewhat lightly colored. And so, yes, he was, he's wearing a blue mask because this is COVID. This is very soon after everything was shut down. And he's also wearing a blue glove. So at times you see movement in the car, but you never see him do this. You only see it bob down once, really just once. There's another object on the floor right next to him. So we don't know what he was actually doing in those circumstances. We don't see a gun. Now there's a Gatorade bottle on the floor. And the government's arguing, well, you never see him pick that up and drink it. Well, you never see him pick up a gun either. You actually don't even see his hand. What's the argument about the glove on the hand? The glove on the hand, so they wanted to show that he... No, no, what's your argument in response to the fact that there was a glove on just one hand, I take it? Just one hand. And I don't think he was emulating Michael Jackson. I think he just had one glove on his right hand, which is his dominant hand, where he shakes hands and mostly touches things. But that'd be the firing hand. That would be the firing hand. So what's your response to that additional fact? Well, I think that goes hand in hand with the position of the gun. So the government's argument was that he's wearing this on his right hand so he doesn't get fingerprints on the gun. And they also talked about the gun being under the seat, where they say only he could have placed it, at least in that instance. So you're holding a gun with your right hand, you're holding it like this. And their argument, because this is their argument, and frankly we were sort of taken off guard that they were going to make an issue out of this. But they said that the placement of the gun was important. If I'm passenger seat here, driver's seat here, passenger door here, the gun is facing this way. It's like this. Here's the handle sticking out so that it can be grabbed by someone who's sitting in that seat. But the barrel is pointing this way. And if you're holding this gun and you're putting it under the seat with your right hand, you're putting it like this. And when they demonstrated this, when Officer Driscoll was giving testimony about this, he flipped his hand like this in a very awkward position. It's not how a right-hand person would have placed it. I thought that was significant. Because that was their argument. But they were telling this jury something the exact opposite of what it would have done. And they were going to demonstrate at this one point, and they decided not to. Do we have any explanation as to why he had a glove on one hand? I'm not saying you have to have one, but it is a curious fact. I don't know the reason for that. Maybe he simply didn't have another glove. Thinking back in 20... Do we know what kind of glove it was? Just like a rubber glove that... Rubber glove. A rubber glove. It was glue latex, I thought it said, right? Latex. Thinking back in 2020, how did any of us acquire PPE? I can barely remember at this point. Maybe it was given out at CVS. Which I guess follows back to what you said when you did start, which is you talked about preponderance of the evidence. And that's one way to think about it. But the other way to think about it is this seems like a very triable case. And yet he didn't prevail. And so that's what makes it hard, not in a joking way, for an appellate court to do something about that. Because these things can be argued. And you're doing a good job, and Mr. Quinlivan's going to do a good job. So then what are we supposed to do? And what is the legal mechanism to get where you want us to go? I think when you look at, because they're going to, he'll argue a totality, the circumstances case. I don't think there was any evidence that he ever possessed the gun. He never made furtive gestures toward the gun. It's simply, okay, you see him moving one time forward, and we don't know what he was doing. I don't think that's sufficient evidence to show that he actually possessed that gun. And under the cases that this court has decided, and there are very few cases where they've gone the other way, but there aren't the circumstances present that would swing the pendulum over to him actually possessing that gun, under constructive possession theory. I see we have a minute left. Do you have any other questions? Actually, you have a minute over. Oh, I have a minute over.  Then I will secede to my brother counsel here. Attorney Quinlivan, please come up and introduce yourself on the record, please. Good morning, Chief Judge Barron, and may it please the Court. I'm Mark Quinlivan on behalf of the United States. I think the Court has accurately set out the different factors that the jury could have considered in its totality in reaching the conclusion that it did. I'm not going to belabor them, but I do want to address a couple of the points that have been raised. One is the blue surgical glove. So, yes, this did occur in April of 2020, shortly after COVID. But the defendant, again, is wearing the glove only on his right hand. There's video that's taken from inside the Fuentes Market when the group comes inside. And the video shows the defendant touching a few of the items on the shelves one or two times with his left hand. His right hand is in the pocket. So a jury could infer from the fact that he's using the left hand to touch items and keeping the right hand in the pocket that the glove was not being used, or that the concern was not because of protection from COVID, but because he wanted to make sure that there were no fingerprints on the firearm. On the point about the positioning of the gun, I want to emphasize that the defense had every opportunity to raise that issue at trial and did not. And I want to go through how the issue came up. So you see it's on page 173 of the appendix. Officer Driscoll is asked, did the positioning of the gun lead you to believe that it was possessed by anyone? He focused on the handle. He said, yes, the handle was facing outward. And then he made a gesture, bending down, and says, it's just as I would have placed it if I were in that seat. Can I just ask about that? And I want to just see how this relates to Lozano, because I don't think they're disputing that someone placed the gun there. So I'm not so understanding why it's very powerful evidence that that's how a person would have placed it there. The relevant question is whether this person placed it there. The detention isn't like it randomly ended up under the seat. Obviously it was placed there. So the fact that it was placed there in the way that something would be placed there isn't all that probative that this person placed it. And the reason I ask that is your parenthetical on Lozano says that the precarious angle position in which the gun was found negated any inference that the gun was placed there before the Nissan came to a complete stop. And it would have been impossible for someone in the back seat to press the gun. So in Lozano, it wasn't just that the gun was there in the way a person would have placed it. There was evidence that it could not have been placed there prior to the time in which the person who was in the seat would have been in the car. And that's the one piece that seems to be absent here that does concern me some, that we'd be going a step beyond Lozano, which I think is the force of the argument, you know, you stepped up to the podium, you don't know what's in the podium. He sits in the seat, he doesn't know what's in the seat. So what is it that ties him to the seat? I don't find particularly probative the fact that the gun is there the way a person would place a gun there. Because the relevant question is, is he the one who placed it there? So what is probative of that? Okay. And I want to emphasize there are actually several points, and again, it's the totality. So, of course, we only have the videos that are taken once this incident occurs. But one relevant factor is that from the time the Ford Fusions enters the parking lot of Fuentes Market until the time it exits and then it stops shortly thereafter, the video and the video evidence is uninterrupted. No one else has access to the front passengers. But there's no testimony that no one ever had access in all the days before. No, that's what I said. I agree. It's just from that point forward. There's also on redirect examination. But just on that point, isn't that the force of the testimony that was present in Lozano that's absent here, that there was some reason to think the gun had to have been placed during a time in which the passenger was in the car? Well, and I think it was actually even much more than during the time the passenger was in the car. I think the testimony was that it must have been placed right after that car stopped, right before the officer came up, because it was tilted at an angle such that if the car had moved. That's a direct link to the person who's sitting in the seat. What is the equivalent thing here? The fact that no one else was in it during this period of time isn't really answering that if there's no reason to think it couldn't have been placed before. Agreed. So then you take into account the fact that Detective Medina, who watched the videos, take it from outside the Fuentes Market. And it's not just one occasion. There are two separate occasions in which he could see through the windshield the blue mask. On the first occasion, he testified that he could see the head popping up from the front mat area of the seat. And then after the group goes into the Fuentes Market and they come out and they're about to leave, and critically, one of the Boston Cruisers has now gone by and is responding to the scene, he can see the defendant again leaning his head down or the blue mask going down. Counsel, can I just ask you, because I think sort of the crux of the case here is we have case law that says if you stack inference upon inference upon inference at some point, it's problematic, especially if at the end of the day the various inferences could actually go either way. And I think that's just what concerns me about this case is it does feel relatively thin. So the testimony that you were just talking about, I read that. But there's also testimony saying that given where the gun was, it wouldn't actually have been possible to even see the gun unless the person dipped their head very far down, much more than the amount of dip that was viewed on the video. And so I saw the points that you're mentioning. But why at the end of the day do you think they're really enough here? Because this does seem weaker than the other cases. And I know sufficiency is a very tough standard on appeal for the defendant. But it is substantially weaker than some of the other cases that you cited. So can you just directly – why is this not inference upon inference stuck together? And it is a circumstantial case, admittedly. But – and again, I want to go through the factors because I think you do have to take them into consideration and how they relate to each other. Again, the gun's under the seat. The jury did hear Officer Driscoll's testimony that it was positioned in a way, as he said, that he believed that it was put there by the front passenger seat occupant. You then have the fact – and again, it's admittedly only evidence as to what happened in the Fuentes Market. But during that entire period, no one else has access to the front passenger seat. Detective Medina then testifies that on those two occasions he sees the defendant's head on one occasion popping up, on another occasion leaning down towards that mat area. And then finally there is the blue glove only on one hand. And the jury saw a video of the defendant, again, touching items with his left hand and could infer from that evidence that he had the blue glove because he didn't want to get fingerprints. And I think it's important to take the entire context of what was happening here. There had been a shooting. One of the victims of the shooting appears with a cell phone and appears to be making a call. You then see the Ford Fusion about really only like 30 seconds later appearing on the screen. It goes to the Fuentes Market. But there's no evidence, right? I mean, I think this is the other thing that concerned me about it. There's no evidence ever actually connecting the defendant to that phone call and his cell phone was recovered. There's no evidence in the record that there was a phone call made to him or to one of the other people in the car. And the car appears a minute and five seconds, I think, after the shooting, which seems awfully quick. I think that's part of what's bothering me is there was this suggestion that somehow they were responding to their friends. I think that was said at closing. But there was not actually any evidence of that from what I could tell at the trial. There isn't evidence of who that individual was making the call to. But what's undisputed is that the defendant in the Ford Fusion goes to the Fuentes Market, and then the group meets up with the victims of that shooting. I think it's a reasonable inference, and a jury could certainly. But you're using the phrase meets up. I think the evidence just shows that they're there in the parking lot together. What's the basis for saying they met up? Because that sounds planned. Well, the Ford Fusion comes into the parking lot, and then the three victims enter the parking lot at different times. But the market's around the corner, isn't it? Yes, I believe it was a block and a half away. They then are having a long discussion. Again, we don't know what they were talking about, but we do see one of the victims pointing to where the shooting had taken place. As I said, they go into the market. They go back out. Another discussion in which the defendant is involved takes place. A Boston Cruiser goes by. The Ford Fusion then enters the market. It's at that point that Detective Medina could see again through the windshield on the video the defendant's head bending down towards the front mat area. Is there any evidence about the defendant's relationship to the Ford Fusion? I don't believe there is, Chief Judge Barron. Well, we know it's not his car. I meant that would tie him to it. It would be unlikely whether he was in it ever before. We have no idea whether this is the first time he was ever in it. That's correct. I mean, Judge Rookman raises inference upon inference versus, and then you say, circumstantial. So how do you draw that line? So as I hear what you're saying, you're saying, well, there's a gun there. He looks down. There's evidence that a jury could conclude he looks down in an area where he Some people say he could see it. Some people say he couldn't, but he's looking down. And then he has something about him that suggests he has some concern about his right hand by wearing a glove. So I guess what I'm wondering is if it's an actual possession case, he has to be holding the glove. But the law recognizes constructive possession where you don't have to be holding it. So what is the difference between inference upon inference, and that's not okay, and circumstantial evidence, which is it is okay. And we're starting from a presumption he's not holding it. So how do we do that? Well, I think I guess the best way to analyze that is that it's not stacking inference upon inference because the inferences relate to each other. And so, yes, the blue glove. There could be any number of reasons that an individual has a surgical glove only on one hand. Taken in isolation, not that many. Well, you're right. But, again, you then have the additional evidence. But it is COVID. I mean, it's just weeks into COVID. It is weeks into COVID. You're absolutely right. So, again, it's not just that evidence because the jury saw the video from inside the Fuentes Market where the defendant has his gloved right hand in his pocket, and it touches one or two items. It's reasonable for a jury to infer from that that the reason that the defendant was wearing that glove was not because he was concerned about COVID. So that's not stacking inference upon inference because that's a reasonable inference that the jury could draw from that evidence. And it ties in at that point with the other evidence in the case. The fact that Detective Medina, again, saw the defendant on two occasions with the head either popping down or popping up. Do you want to just address, given the hand that had the glove, the point that they make about why the angle? In Lozano, it was a key point of the reasoning. It doesn't mean it was necessary to find constructive possession. The angle revealed something about when it had to have been placed. Their contention here is the angle of the gun is actually somewhat at odds with the theory of the gloved hand. So what's your answer to that? My answer to that is that what the defendant on that point is asking this court to do is essentially engage in fact-finding because that argument was never made below. Oh, it was not made below? It was not below. No, and I want to direct your court's attention. So Officer Driscoll testifies that because the handle was pointing out, that's what led him to believe that it was placed there by the front seat occupant. It's not which direction the barrel is pointing. No testimony about the barrel at that point. That issue, therefore, was fodder for cross-examination. So you then go to page 185 of the appendix, and that's where this issue comes up. And defense counsel says, is there another way that someone in a car could place a gun? There's an objection. The judge allows the question, and counsel reformulates it. Is there another way that somebody in a car could position a gun under their seat? Officer Driscoll asks, are you talking about the passenger? And defense counsel clarifies. He says, no, I'm talking about anyone. And Officer Driscoll says, yeah, there are different ways someone could position a gun. And then defense counsel uses the example. For example, I could have put that gun there at 5 o'clock that afternoon. And he answers yes. So the focus of that was on other individuals in the car, not the direction of the barrel of the gun. The direction of the barrel of the gun then only came up on redirect. If I could just finish this, and it's on pages 199 to 201, only came up on redirect relevant to whether the driver could have placed the gun in that position or whether the rear seat occupant could have positioned the gun. Nothing on recross about the barrel of the gun and how it related to the driver. Is it Driscoll's contention that this is how the person sitting in the seat would have placed it there? I mean, does this become the centerpiece of anything? I don't believe it was the centerpiece. I think, again, it was one of the, you know, I think the term used was like the key points that taken together could lead to rationality. Was there a response in the end that, no, what Driscoll said is false, that doesn't work? No. I don't believe so. Thank you. Thank you. Thank you, Counsel. Will Attorney Super reintroduce yourself on the record? You have a two-minute rebuttal. Thank you. Steven Super for Chevin Abercrombie. So the testimony was not that the front passenger put the gun beneath the seat. The testimony was that a right-handed person put it under the seat. It was just the handle sticking out. Okay, that tracks. But this was a placement of a gun in a specific area. The implication very strongly made that the person could reach down, pull it up, and be ready to shoot. Why that gun was there, I don't know. Throughout this trial, they painted Chevin Abercrombie as an angry man and someone who's fairly savvy and kind of a product of the street, and he was. But in watching those videos, and I watched them many times, I had to wonder because he was actually convicted before of being a felon in possession. That's why he was on supervised release. So he knows the game, and you can see in the videos, there are six or seven patrol cars going past all the time, and they get stopped often. He has a lifetime of being stopped. So since we're speculating, I had to speculate, why didn't he just get rid of the gun at that point? He knows there's a really good chance. He doesn't know that his car was the one that was identified, misidentified as the one that took place, that committed the drive-by shooting. But he knows those cops, and they know him, and so he could have easily taken it out and put it in the trunk. Dominic Douglas opened the trunk at one point and pulled out a jacket. He could have put it in the trunk, and then you'd need an warrant to get in there. The driver, is there any evidence about the driver in the case? He pleaded the fifth, and they never charged him. He was the one who blurted it out. We're just coming from the store, which is true. You can search the car. Now, if Tevin Abercrombie is sitting next to him and leaning over all the time, as the claim was, then he would at some point would have asked, like, you know, what are you doing? Because the gun is right there. He would have seen it. He would have known it. But he's acting like he doesn't know it himself that the gun is there. And is he the owner of the car? He's the owner of the car. Okay, thank you. If I could, can I make just one closing remark? And you can take this as you will. But this is five and a half years after this incident happened. And I've had many conversations with Mr. Abercrombie. Of course, they're privileged. But to this day, I don't know if that was his gun. And I don't think Attorney Gormley knows that that was his gun. And if I don't know, knowing all the stuff that was in the discovery, things that didn't come out of trial, if I know all this, and I still don't know if that's his gun, government doesn't know if it's his gun, and that jury certainly didn't know if that was his gun. Thank you. Thank you, counsel. That concludes arguments in this case.